**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **KLAYTON FENNELL** | **CIVIL ACTION** |
| **v.** | **NO. 19-4750** |
| **COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC & COMCAST CORPORATION** | |

**MEMORANDUM RE: MOTION FOR SUMMARY JUDGMENT**

**Baylson, J.**                                                              **September 16, 2022**

**Table of Contents**

I.    Introduction ............................................................................................................. 2
II.   Relevant Factual Background ................................................................................. 4
  A.   Fennell Ascends in Rank at Comcast ................................................................ 4
  B.   Scope of Fennell's Job Responsibilities ........................................................... 6
    1.   Responsibilities as SVP Government Affairs ............................................... 6
    2.   Responsibilities as Principal of LGBTQ+ External Affairs ......................... 7
  C.   Other SVP Government Affairs at Comcast ...................................................... 8
  D.   How Compensation of SVP Government Affairs is Determined at Comcast ..... 9
  E.   Compensation of Fennell and Other SVP Government Affairs ........................ 10
III.  Procedural History of Fennell's Complaints ......................................................... 12
  A.   Fennell's Internal Complaint at Comcast, 2017 ("Internal Complaint") ......... 12
  B.   Fennell's Administrative Complaint, 2018 ("Administrative Complaint") ....... 13
  C.   Fennell's Complaint Filed in the Eastern District of Pennsylvania, 2019 ("EDPA Complaint") ........................................................................................................ 14
    1.   Comcast's Motion for Summary Judgment ................................................ 15
    2.   Fennell's Motion to Strike the Lau Declaration ......................................... 18
    3.   June 8, 2022 Oral Argument and Supplemental Briefing ........................... 18
IV.   Legal Standard ...................................................................................................... 21
V.    Discussion ............................................................................................................. 22
  A.   Title VII Pay Discrimination on the Basis of Sexual Orientation ................... 22
  B.   Fennell Is Unable to Establish a Prima Facie Case of Pay Discrimination on the Basis of Sexual Orientation ........................................................................................... 26
    1.   Fennell Has Failed to Show How "Similarly Situated" Employees Were Treated More Favorably ......................................................................................................... 26
    2.   In the Alternative, Plaintiff's Stated "Background Evidence" Is Not Enough to Support an Inference of Discrimination ...................................................................... 38
  C.   Comcast Has Proffered a Substantive, Non-Discriminatory Reason for the Pay Disparity ......................................................................................................... 38

   D.   Even If Fennell Could Make a Prima Facie Showing, There Is Insufficient Evidence
Showing Comcast's Explanation Is Pretext for Unlawful Discrimination ............................. 39
      1.   Evaluating Pretext at Summary Judgment ................................................. 39
      2.   Parties' Arguments ...................................................................................... 40
      3.   Analysis ....................................................................................................... 42
   E.   Plaintiff's Claim of Retaliatory Hostile Work Environment Fails ................................. 48
      1.   Elements of a Retaliatory Hostile Work Environment Claim ..................... 48
      2.   Fennell Fails to Establish a Prima Facie Case of
Retaliatory Hostile Work Environment ............................................................. 51
VI.   Conclusion ...................................................................................................... 54

* * * * *

Plaintiff Klayton Fennell, who identifies as an openly gay, gender nonconforming male, has held a senior-level executive position at Defendant Comcast Cable Communications Management, LLC since 2015.  He brings this employment action against Comcast Cable Communications Management and Comcast Corporation (collectively, "Comcast") for pay discrimination and retaliatory hostile work environment on the basis of his sexual orientation, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII") (Count I), the Pennsylvania Human Relations Act, as amended, 43. Pa. C.S. § 951, et seq. ("PHRA") (Count II), and the Philadelphia Fair Practices Ordinance, Phila. Code § 9-1101, et seq. ("PFPO") (Count III).

## I.   Introduction

There is a strong movement throughout the corporate and business worlds, as well as in education, government, and even judicial selection procedures, to increase "diversity" on many fronts.  Congress itself has enacted laws recognizing diversity is a virtue to be supported. Diversity can be achieved, and exhibited, in many ways, such as prioritizing inclusivity and equality through a recognition that each individual in our society is unique.  Diversity serves many goals.  Diverse individuals are, by definition, different from other individuals.  In

employment situations, diversity can be achieved by employing, promoting, and supporting employees from historically underrepresented groups, such as individuals of different races or ethnicities, those with disabilities, and members of the LGBTQ+ community.

Comcast, in its defense of this case, and in its Motion for Summary Judgment, asserts that it has fully supported diversity in its corporate employee practices and that its actions regarding Plaintiff show the benefits of diversity by the fact that Plaintiff, a gay man, has achieved a very high executive position at Comcast.   Plaintiff has been designated by Comcast as its "representative/liaison" to the LGBTQ+ community nationally, and not just limited to the Philadelphia area.  Comcast asserts that its executives' and employees' conduct and comments, with regard to Plaintiff, based on undisputed facts, and taking Plaintiff's asserted but disputed facts in the light most favorable to Plaintiff, requires granting Comcast's Motion for Summary Judgment.

Plaintiff has documented in his Opposition to Comcast's Motion for Summary Judgment that he has been subject to a "gay pay gap," supported by his annual gross compensation being lower than other allegedly similarly situated individuals at Comcast who are not members of the LGBTQ+ community.   He also has documented several instances where some Comcast executives have acted, or made remarks either to Plaintiff or about Plaintiff, that Plaintiff asserts would not have been made to or about a "straight" male corporate executive.  Plaintiff asserts these instances—whether verbal or conduct, whether direct or circumstantial—are sufficient to require denial of Comcast's Motion for Summary Judgment and a jury trial to determine whether Comcast discriminated against Plaintiff.

Achieving diversity in the workplace—from senior executives in the C-Suite, to hourly wage workers—will inherently result in some employees who are indeed "different" than others.

And, despite protections in place, including through Title VII and state law, diverse individuals may continue to perceive discrimination because of their differences.  But the mere fact that some within the workplace may make comments about a diverse coworker does not itself, without an underlying discriminatory animus by the employer, impose Title VII liability on an employer.  Any conclusion otherwise would discourage discussions about diversity, returning us to a time when employees' differences were unspoken, unacknowledged, and, therefore, unappreciated.

For reasons stated below, the Court concludes that the facts cited by Fennell are insufficient and require granting of Comcast's Motion for Summary Judgment.

## II.     Relevant Factual Background[1]

### A.  Fennell Ascends in Rank at Comcast

Klayton Fennell has worked for Comcast since May 31, 2001.  Pl.'s Counterstatement ¶ 1.  At all times during his employment at Comcast, Fennell has presented as an openly gay member of the LGBTQ+ community.  Id.at ¶ 2.  He has a college and law school degree.  Id. at ¶ 38.

---

[1]     This Court's practice rules require a party moving for summary judgment to set forth all undisputed facts in numbered paragraphs.  The responding party must either admit or deny (with reasons) each asserted undisputed fact.  The responding party can also submit additional facts, to which the moving party must respond, paragraph by paragraph.  All paragraphs must have record support.  Although the parties have generally followed this practice, as pointed out below, Plaintiff has omitted record support for a number of his assertions.

Unless otherwise indicated, all facts, taken in the light most favorable to Fennell, are derived from Comcast's Statement of Undisputed Facts ("Def.'s SUF"), Fennell's related response and counterstatement (respectively, "Pl.'s Resp. to Def.'s SUF" and "Pl.'s Counterstatement"), or Comcast's Response to Fennell's Counterstatement ("Def's Resp. to Pl.'s Counterstatement").  See ECF 29, 39 & 48.

Fennell, who began his employment as Comcast's Director of Government Affairs, is based at Comcast's Headquarters in Philadelphia, Pennsylvania.  Id. at ¶ 1.  During the first year of his employment, Fennell participated in the AT&T Broadband transaction by shepherding it through the local and state regulatory approval process, and he worked with Bret Perkins to launch Comcast's Government Affairs' training program.  Id. at ¶ 3.  After approximately one year at Comcast, he was promoted to Regional Vice President of Government Affairs, Community Investment and Communications for Comcast in South Florida.  Id. at ¶ 4.

In 2011, Plaintiff was promoted to Vice President of Government Affairs and relocated back to Comcast's Headquarters in Philadelphia.  Id. at ¶ 5.  As Vice President of Government Affairs, he reported to Rick Smotkin.  Id. at ¶ 6.

On March 30, 2015, Fennell was promoted to Senior Vice President of Government Affairs ("SVP Government Affairs").  Id. at ¶ 7.  He reports to Perkins, who is currently Senior Vice President of External and Government Affairs.  Id. at ¶ 8; see also Mot. for Summ. J. (ECF 29), Ex. 2 ("Perkins Depo.") 14:11-13 (indicating that Perkins has supervised Fennell for approximately nine years).  Fennell also reported to Kathryn Zachem—then Executive Vice President, Federal Regulatory and State Government Affairs—in connection to an "'array' of special projects or in connection with transactions."  Pl.'s Counterstatement ¶ 8.  Fennell remains SVP Government Affairs, and, at all relevant times, has been the only openly gay person to hold that position.  Id. at ¶ 11.

**B.  Scope of Fennell's Job Responsibilities**

         **1.      Responsibilities as SVP Government Affairs**

As SVP Government Affairs, Fennell has been relied upon as the "go to person" by senior leaders and other SVPs Government Affairs for "complex projects" and issues.  Id. at ¶ 19.  Fennell's job responsibilities as SVP Government Affairs include the following:

- "Lead[ing] franchising and the evolution of franchising policy, strategy, renewals, regulatory trend analysis, reporting, planning (network expansion), competitive equity interests, implementation of franchise and regulatory reform, and franchise database management," id. at ¶ 12;

- "[D]evelop[ing], driv[ing] and support[ing] a predictable model for managing all local legislative policy regarding matters that impact Comcast's business, operations, or the overall business climate in Comcast's nearly 6,000 communities across thirty-nine (39) states and the District of Columbia," to include initiatives concerning wage equity, universal paid lead, living wages, and local minimum wage, id. at ¶¶ 13-14;

- "[P]rovid[ing] local regulatory affairs and policy analysis, planning and coordination to corporate stakeholders and the field on operational issues, including price adjustments, programming costs, privacy, broadband speed increases, privacy, network neutrality, impact and inclusion initiatives, and network performance and reliability," id. at ¶ 15; and

- "[D]evelop[ing] and maintain[ing] resource and reference material such as policy statements, talking points and advocacy materials, develop[ing] and facilitate[ing] training and briefings as needed, and coordinat[ing] and

6

support[ing] relationships with business, industry and policy coalitions that are of

common interest," <u>id.</u> at ¶ 16.

Fennell "directly manages, supports[,] and develops a team consisting of a Vice President of

Government Affairs and a Senior Director of Local Policy and Government Affairs Operations."

<u>Id.</u> at ¶ 17; <u>see also</u> <u>id.</u> at ¶ 44 (stating that Fennell has two (2) direct reports); <u>but see</u> <u>id.</u> at ¶ 24

(indicating that Fennell had four (4) or five (5) direct reports).  He also leads and supports local

field team members working in Government Affairs.  <u>Id.</u> at ¶ 18.  The geographic scope of his

position covers Comcast's entire footprint, encompassing thirty-nine (39) states and the District

of Columbia.  <u>Id.</u> at ¶ 41.  Fennell has shared oversight over the Headquarters' Government

Affairs budget, which is "owned" by Perkins, but he does not have independent budget

authority—<u>i.e.</u>, he is required to obtain budgetary approval from a direct supervisor.  <u>Id.</u> at ¶¶ 42-

43.

### 2.    Responsibilities as Principal of LGBTQ+ External Affairs

Fennell serves as the Principal of LGBTQ+ External Affairs.  <u>Id.</u> at ¶ 20.  In this position,

Fennell is the primary point of contact, brand, and policy representative to numerous national

and regional policy and service organizations operating in the LGBTQ+ space.  <u>Id.</u>  His

responsibilities include:

- "[H]elp[ing] craft, implement, and manage initiatives with LGBTQ+ groups that

  demonstrate how Comcast's innovation, connectivity, entertainment, news and

  integrated diversity, equity and inclusion and community values help drive

  LGBTQ+ equity and progress," <u>id.</u> at ¶ 21;

- "[M]anag[ing] requests to Comcast to take branded positions on legislative initiatives that do not directly and uniquely impact Comcast's business or operations," id.; and

- "[C]hair[ing] internal cross-enterprise efforts to maximize and promote LGBTQ+ inclusion initiatives with external partners." Id.

Fennell maintains a budgetary oversight of approximately $1 million for his LGBTQ+-related external affairs responsibilities. Id. at ¶ 22; but see Def.'s Resp. to Pl.'s Counterstatement ¶ 22 (stating that Fennell "does not own this position of the Corporate-HQ budget").

## C. Other SVP Government Affairs at Comcast[2]

Fennell cites facts about five individuals who have the title of SVP Government Affairs, all of whom he alleges are comparators. At the time of Fennell's promotion to SVP Government Affairs, at least four of those individuals held the same title: G.J., G.T., M.C., and R.M. Pl.'s Counterstatement ¶ 9. At least one individual, B.M., was promoted to SVP Government Affairs at around the same time as Fennell. Id. at ¶ 10. Of those five (5) individuals, three (3) held the broader-in-scope position of Division Senior Vice Presidents: R.M., G.T., and M.C. See Pl.'s Resp. to Def.'s SUF ¶ 40.

Additionally, Comcast suggests Fennell selectively ignores another SVP Government Affairs, Rick Smotkin, as a proposed comparator. See, e.g. Mot. for Summ. J. 2-3. In his response to Comcast's Motion for Summary Judgment, Fennell opposes Comcast's suggestion that Smotkin is a comparator. Resp. to Mot. for Summ. J. 12-14.

---

[2]     For privacy, Fennell's alleged comparators are referenced throughout by reverse initials; the identity of each individual is easily discernible by the parties.

The Court will review the facts for each person's job responsibilities in infra Section V.B.1.i noting that Fennell only discusses in detail the job responsibilities of B.M. and Smotkin.

### D. How Compensation of SVP Government Affairs is Determined at Comcast

According to Fennell, Comcast has "no uniform process for determining compensation" for SVPs Government Affairs. Pl.'s Counterstatement ¶ 99. There are two decisionmakers making compensation determinations for all SVP Government Affairs; those individuals are Sandra Lau, SVP Human Resources, and David Cohen, formerly Comcast's Senior Executive Vice President and Chief Diversity Officer. Id. at ¶ 49. Perkins and Zachem also had a role in setting Fennell's compensation. Pl.'s Resp. to Def.'s SUF ¶ 28. Cohen had the ultimate decision-making authority with regard to Fennell's merit increases. Pl.'s Counterstatement ¶ 50.

A number of Comcast executives testified as to how Comcast determines compensation for SVPs Government Affairs. See id. at ¶¶ 101, 105-109. Lau testified that compensation for a SVP Government Affairs is determined, in part, by whether the individual is "external facing, internal facing." Id. at ¶ 106. She also testified that a SVP Government Affairs' level of "remit" is a consideration when determining compensation, as is business title, the number of employee's managed, the nature of the role, and budgetary responsibility.[3] Id. at ¶¶ 48, 101; see also Resp. to Mot. for Summ. J., Ex. H ("Lau Depo. I") 189:19-190:16. However, Comcast does not maintain job descriptions for SVP Government Affairs positions, including Fennell's position. Pl.'s Counterstatement ¶¶ 102-03; Def.'s Resp. to Pl.'s Counterstatement ¶¶ 102-103. Zachem,

---

[3]      "Remit" does not appear to be defined in the record. See Pl.'s Counterstatement ¶ 101. However, Lau's testimony suggests that an employee's "role"—i.e., their job description—is seemingly synonymous with "remit." Plaintiff offers no evidence that "remit" means anything to the contrary. Lau Depo. I 189:19-190:16.

also testified that performance has a role in compensation determination.  Pl.'s Counterstatement ¶ 108.

A SVP Government Affairs' total compensation is determined not just by base salary. The total amount a SVP Government Affairs receives per annum includes an annual bonus and Management Grant.  Id. at ¶ 53-56.

### E.  Compensation of Fennell and Other SVP Government Affairs[4]

Of the five individuals that Fennell provides as comparators (B.M., G.J., R.M., M.C., and G.T.), Fennell, since at least 2015, has had the lowest base salary.  Pl.'s Counterstatement ¶ 53. From 2015 to 2017, Fennell had a nearly identical, albeit marginally less, base salary compared to Smotkin.  Id.

**Table 1: Base Pay (SVP Government Affairs)**

|           | 2015      | 2016      | 2017      | 2018      | 2019      |
|-----------|-----------|-----------|-----------|-----------|-----------|
| Fennell   | $260,042  | $267,843  | $275,878  | $284,155  | $292,679  |
| B.M.      | +5.6%     | +6.6%     | +7.5%     | +7.5%     | +7.5%     |
| G.J.      | +26.7%    | +28.5%    | +29.5%    | +30.0%    | +31.8%    |
| R.M.      | +28.0%    | +28.4%    | +28.7%    | +28.7%    | +31.0%    |
| M.C.      | +14.3%    | +14.3%    | +14.8%    | +14.8%    | +14.8%    |
| G.T.      | +4.7%     | +5.2%     | +6.7%     | +6.9%     | +6.9%     |
| Smotkin   | +0.02%    | +0.02%    | +0.02%    | --        | --        |

See id. at ¶ 53; DEF-010495-96.

---

[4]    Fennell's counsel indicated on the telephonic conference held August 17, 2022 that they are satisfied with the discovery they received regarding Comcast's compensation data.

Between 2015 and 2017, Fennell's <u>annual bonus target</u> was equal to Smotkin's and less than the five other individuals'.  Pl.'s Counterstatement ¶ 54; Def.'s Resp. to Pl.'s Counterstatement ¶ 54; DEF-010495-96.  In 2018 and 2019, Fennell had the same annual bonus target as the other individuals, aside from Smotkin (who had left Comcast in 2017).  Pl.'s Counterstatement ¶ 54; Def.'s Resp. to Pl.'s Counterstatement ¶ 54; DEF-010495-95-96.

For the relevant period, Fennell received the lowest <u>annual bonus</u> of all six individuals. Pl.'s Counterstatement ¶ 55; DEF-010495-96.

In 2015, Fennell had the same <u>management grant target</u> as Smotkin, and had a higher management grant target than him in 2016 and 2017.  DEF-010495.  For 2015, Fennell had the same management grant target as G.T., and had a higher management grant target than him in 2016; Fennell had a lower management grant target compared to G.T. from 2017 to 2019.  Pl.'s Counterstatement ¶ 56; DEF-010495.  From 2015-2019, Fennell received a lower management grant target than B.M., G.J., R.M., and M.C.  Pl.'s Counterstatement ¶ 56; DEF-010495-96.

In sum, Fennell had a nearly identical, but slightly lower, <u>gross compensation</u> compared to Smotkin in 2015.  Fennell's gross compensation was higher than Smotkin's in 2016 and 2017. From 2015 to 2019, Fennell received a lower gross compensation than the other five individuals. Pl.'s Counterstatement ¶¶ 54-56; DEF-010495-96.

**Table 2: Annual Gross Compensation (SVP Government Affairs)**

|         | 2015         | 2016         | 2017         | 2018         | 2019         |
|---------|--------------|--------------|--------------|--------------|--------------|
| Fennell | $552,061.00  | $613,373.00  | $625,024.00  | $679,648.00  | $693,287.00  |
| B.M.    | +18.6%       | +17.7%       | +18.3%       | +11.8%       | +14.9%       |
| G.J.    | +35.9%       | +37.5%       | +38.1%       | +32.1%       | +35.8%       |

| R.M. | +36.8% | +28.9% | +40.2% | +33.9% | +37.7% |
| M.C. | +34.2% | +25.7% | +31.8% | +25.4% | +25.2% |
| G.T. | +10.2% | +2.1% | +24.2% | +17.8% | +17.6% |
| Smotkin | +0.02% | -8.5%% | -8.3% | -- | -- |

## III.   Procedural History of Fennell's Complaints

### A. Fennell's Internal Complaint at Comcast, 2017 ("Internal Complaint")

In approximately December 2017, Fennell was informed by an unnamed Comcast employee within Human Resources "of a noticeable pay difference between [Fennell] and all other Senior Vice Presidents of Government Affairs," specifically identifying G.J., B.M., R.M., M.C., and G.T.  Pl.'s Counterstatement ¶¶ 77-78.  Shortly thereafter, Fennell went to Perkins to initiate an internal complaint about a "gay pay gap" at Comcast and request a pay adjustment.  Id. at ¶ 79.  In connection with his internal complaint, Fennell provided Perkins a memorandum detailing his concerns "that he was being paid disparately on the basis of his status as an openly gay man."  Id. at ¶ 80.

Lau reviewed Fennell's memorandum and held conversations with Perkins, Zachem, Cohen, and William Strahan (a high-level Human Resources professional at Comcast).  Id. at ¶ 83; see Resp. to Mot. for Summ. J., Ex. R ("Strahan Depo.") 8:4-9:12.  Perkins shared with Lau that Fennell's accounts of being treated differently because of his sexual orientation were "dated . . . at least a decade old, if not more."  Def.'s Resp. to Pl.'s Counterstatement ¶ 84; Lau Depo. I 61:9-23.

According to Fennell, in response to his Internal Complaint, Comcast did not conduct a pay treatment study to determine whether employee members of the LGBTQ+ community were being paid less.  Pl.'s Counterstatement ¶ 93; Def.'s Resp. to Pl.'s Counterstatement ¶ 93 (stating

that no such analysis occurred because "Comcast did not have the data to conduct one"). Rather, Comcast "adopted the belief that employees who identify as part of the LGBTQ community 'wind up receiving more recognition by way of development and compensation' than their heterosexual counterparts." Pl.'s Counterstatement ¶ 85 (citing Lau Depo. I 147:12-17; Strahan Depo. 61:9-62:9).

Additionally, following Fennell's submission of the Internal Complaint, Zachem stated to Lau that Fennell "ha[d] to grow up/stop the antics." Pl.'s Counterstatement ¶ 89: Resp. to Mot. for Summ. J., Ex. I ("Lau Depo. II") 258:19-261:22.

Ultimately Comcast concluded that Fennell's pay concerns were unsubstantiated and dismissed his complaint as "unreasonable." Pl.'s Counterstatement ¶ 94. There was no "memorialization" of the efforts that Comcast made to look into Fennell's Internal Complaint, or any conclusions thereto. Id. at ¶ 95.

**B. Fennell's Administrative Complaint, 2018 ("Administrative Complaint")**

Fennell filed a complaint with the Philadelphia Commission on Human Relations on June 6, 2018. Id. at ¶ 110. Following filing of his Administrative Complaint, Fennell received a complaint from one of his subordinates about his management style. Id. at ¶ 111. Comcast assigned three (3) Human Resources employees to the matter and "launched a sweeping investigation into [Fennell's] 'management' style." Id. at ¶ 113. This investigation included interviews of all of Fennell's subordinates. Id. The investigation resulted in a "coaching," which "was delivered while [Fennell] was out on medical leave in connection with the emotional distress" he was feeling due to his experience with Comcast. Id. at ¶ 115.

Following filing of his Administrative Complaint, Fennell also experienced other actions that he deemed retaliatory. For example, Fennell states that he was:

- Not invited to meetings that discussed franchising regulatory reform, despite him being responsible for Comcast's local franchising policy and having been invited to planning and strategic conversations in the past, see id. at ¶ 117;

- Received fewer requests to speak at division meetings and was not invited to such meetings, see id. at ¶ 118;

- Not invited to major LGBTQ+ events at Comcast, see id. at ¶ 119;

- Taken off Comcast's Corporate website, and his image was removed from various reports, see id. at ¶ 120;

- "[B]locked" from receiving a backfill for a direct report's position, which resulted in Fennell receiving an increased workload, see id. at ¶ 121 (noting it took a year to receive a backfill);

- Asked to consider taking a demotion to Regional Vice President of Government Affairs position for Comcast's Beltway region, see id. at ¶ 122; and

- Experience an increase in the pay differential between him and other SVPs, to include B.M., see id. at ¶ 123.

## C. Fennell's Complaint Filed in the Eastern District of Pennsylvania, 2019 ("EDPA Complaint")

Fennell filed the instant action on October 14, 2019, alleging two claims: (1) pay discrimination on the basis of sexual orientation during his employment at Comcast as SVP Government Affairs, from 2015 to 2019 (with the most relevant time period being 2017 and 2018)[5]; and (2) a retaliatory hostile work environment claim.  See Compl. (ECF 1) ¶¶ 101-18;

---

[5]     In his Complaint, Fennell suggests that the scope of his disparate pay claim encompasses the entire duration of his approximately two decades of employment at Comcast.  See Compl. Section I ("Defendants have also consistently paid Plaintiff substantially less than his

Resp. to Mot. for Summ. J. 26 n.10.  Comcast answered on December 16, 2019.  See Ans. (ECF 5).

### 1.    Comcast's Motion for Summary Judgment

Following lengthy discovery, Comcast moved for summary judgment as to all claims on December 3, 2021.  Fennell responded on February 8, 2022 (ECF 39).  In his Response, Fennell lists a number of instances over his two decades of employment at Comcast, most of which, but not all, appear in his EDPA Complaint and Administrative Complaint, that he suggests form the backdrop of Comcast's "gay pay gap."  See Pl.'s Counterstatement ¶ 59.  Those instances include the following:

- In 2001, Sheila Willard (then SVP Government Affairs) attempted to "hide" Fennell from the then CFO of Comcast Cable and then General Counsel of Comcast Corporation to "protect" him from anti-gay bias.  Id. at ¶ 59.

- In 2002, Fennell was sent to a professional coach who gave him feedback on his "presentation" and "visibility" and told him that he was "too gay" for Comcast so should move on from the company.  Id. at ¶ 60.  Despite telling Comcast about his experience, the company continued to consult the same professional coach.  Id.

---

heterosexual, male peers who are perceived as conforming to traditional sex and/or gender based stereotypes despite the level of work required of Plaintiff and the skill with which he performs his job.").

However, Fennell now focuses his disparate pay claim on the years he served as SVP Government Affairs, up to the filing of the instant action, namely 2015 to 2019.  See Resp. to Mot. for Summ. J. 2 ("At all times during his tenure as Senior Vice President of Government Affairs, Plaintiff has been paid significantly less than all other current Senior Vice Presidents of Government Affairs.").  And on the telephonic conference held August 17, 2022, counsel for Fennell indicated that his claim is based on the contention that he has been historically paid less at Comcast, with the most relevant years being 2017 and 2018.

- In 2005, Fennell was twice called a f****t by an employee in the audience during a presentation, however Comcast did not conduct an investigation or require sensitivity training following the incident.  Id. at ¶ 61.

- Fennell was told during a phone call that he was "too gay" to visit some of his markets.  Id. at ¶ 62.  Although he reported this incident to the Division President, Comcast did nothing in response.  Id.

- In 2005, Fennell was not selected for promotion, despite having more experience and better performance rankings than the heterosexual male who was selected.  Id. at ¶ 63.  Fennell was told that he was not selected because the Division President was more "comfortable" with the other individual.  Id.  Fennell reported the incident to Comcast, but it did not perform an investigation.  Id.

- Fennell was warned that a Division President teased any member of his leadership team who wears a pink dress shirt into the office, so Fennell opted to participate in communications via telephone while the rest of his team traveled to the Division President's office in Colorado.  Id. at ¶ 64.

- In approximately 2009, Fennell expressed an interest in a Senior Vice President position in Colorado, but he was told by Zachem that he would not be a "cultural fit" given the Division's President's religious beliefs and convictions.  Id. at ¶ 66.

- In or around 2013, Zachem suggested that Fennell take a Regional Vice President position in San Francisco because he would be a "good fit for that market and a 'good representation' in San Francisco."  Id. at ¶ 65.

- Fennell did not receive certain title promotions and pay increases at the same rate as his heterosexual, heteronormative peers.  Id. at ¶ 67.

16

- In 2015, Fennell's requests to sign on to an amicus brief in support of marriage equality were ignored, and he was labeled as being "too personally invested." Id. at ¶ 68.

- Comcast refused to support Fennell in his recognition as a Philadelphia Business Journal LGBTQ leader, despite it being asked to sign on as a sponsor and having done so for individuals in the past who have won such awards. Id. at ¶ 69.

- In 2016, Fennell was marginalized during a meeting and compared to openly gay and gender non-conforming male ice skater Johnny Weir. Id. at ¶¶ 70-71.

- Fennell has received unsolicited comments about his fashion or hair by senior leaders that minimize him and are "detrimental to [his] professional persona." Id. at ¶ 72.

- In 2016, a SVP of Corporate and Digital Communications referred to a female cultural influencer and used the term "turned gay." Id. at ¶ 73.

- In 2016, Lau told Fennell that Cohen referred to him as "high pitched." Id. at ¶ 74.

- Zachem selected Fennell to create a cartoon superhero of one of the Executive Vice Presidents based on the stereotype that he must be creative as a gay man. Id. at ¶ 75.

Comcast disputes each of these instances. Def.'s Resp. to Pl.'s Counterstatement ¶¶ 59-76.

Comcast replied to Fennell's opposition on March 22, 2022 (ECF 48) ("Reply"), and Fennell filed a sur-reply on March 29, 2022 (ECF 52).

### 2.      Fennell's Motion to Strike the Lau Declaration

In its Reply, Comcast relied on the declaration of Sandra Lau—a Senior Vice President of Human Resources at Comcast—to counter Plaintiff's argument as to pretext by showing that there is a range of salaries for SVPs at Comcast, to include non-Government Affairs SVPs.  See Reply 3.  Comcast's reliance on the Lau Declaration provoked a minor "storm" of contentions between the parties as to the contents of the Lau Declaration and whether the documents that she used in support of her Declaration had any relevance to the pending Motion for Summary Judgment.

On March 30, 2022, Fennell moved to strike the Lau Declaration on the ground that Lau relied on documents that Comcast did not produce during discovery.  See Mot. to Strike (ECF 53).  Comcast responded to the Motion to Strike on April 13, 2022 (ECF 58), and Fennell replied on April 20, 2022 (ECF 60).

### 3.      June 8, 2022 Oral Argument and Supplemental Briefing

On June 8, 2022, the Court held oral argument on both pending motions.  In response to the Court's questions concerning the outstanding discovery issue raised by the Motion to Strike, Fennell requested (1) Comcast produce the documents that Lau used in support of her Declaration, and (2) he be allowed to depose Lau, or take a Rule 30(b)(6) deposition, regarding the content of those newly produced documents.  See June 8, 2022 Tr. 4:1-20 (ECF 65). Comcast countered that Fennell already had the information contained within the documents that Lau used in support of her Declaration, and it opposed Fennell's request to have an additional deposition on those documents.  Id. at 5:8-7:2.  The Court ordered Comcast to promptly produce the documents that Lau relied on in support of her Declaration and allowed Fennell to depose either Lau or a Comcast representative on those documents, if the documents were different from

those that Comcast produced during discovery.  See id. at 8:17-9:13 (ordered from the bench).

The Court also provided that the parties, following the production and deposition, may file

supplemental briefs in support of their positions vis-à-vis the two pending motions.  See id.  On

June 27, 2022, Fennell deposed Lau on the documents.  On July 6, 2022, the parties filed their

supplemental briefs.  See ECF 69 & 70.

On July 15, 2022, the Court sua sponte held a recorded telephone conference with the

parties to discuss Plaintiff's contention in his supplemental brief that Comcast had not complied

with the Court's June 8 Order by failing to produce certain spreadsheets concerning employee

compensation data that Lau relied upon in support of her Declaration.  As a result of that call, the

Court ordered Comcast to produce the three spreadsheets in question—(1) the "Late Produced

Lau Declaration Document," (2) the "Counsel Created Compensation Spreadsheet," and (3) the

"Seckinger Spreadsheet"—to Fennell and the Court by July 19, 2022, and provided Fennell an

opportunity to take an additional deposition of Lau as to the three spreadsheets.  See Order, dated

July 15, 2022 (ECF 73).  The Court also provided both parties an opportunity to file additional

supplemental briefing following production of these documents and the additional Lau

deposition. See id.

On July 21, 2022, Fennell informed the Court by letter that Comcast had produced the

three spreadsheets to the Court in unredacted form but had produced to him redacted copies.  See

Fennell Letter, dated July 21, 2022 (ECF 74).  Fennell argued that this discrepancy in form

substantially prejudiced him and requested that the Court order Comcast to produce unredacted

copies to him.  Id. at 1.  Comcast responded to the letter on July 22, 2022, arguing that the

redactions were proper on the ground of relevance.  See Comcast Letter, dated July 22, 2022

(ECF 75).  That same day, the Court ordered Comcast to immediately provide Fennell with the

exact submission it had provided the Court on July 19, 2022 so that the additional deposition of Lau and any supplemental briefing could take place expeditiously as had been ordered on July 15.  See Order, dated July 22, 2022 (ECF 76).  The parties filed their supplemental briefs on August 2, 2022.  See ECF 78 & 79.

In response to the parties' August 2 supplemental briefs, the Court entered an Order requiring Fennell to answer approximately seven (7) questions concerning the three spreadsheets submitted on July 19, and for Comcast to respond to Fennell's answers.  See Order, dated August 5, 2022 (ECF 81).  Following submission of both parties' answers, the Court sua sponte held a recorded telephone conference on August 17, 2022.  During the call on August 17, 2022, Fennell acknowledged that the compensation data provided in the three spreadsheets that had been the subject of many iterations of supplemental briefs contained pay data for 2020 and 2021 that did not constitute the basis of his claim, and that he was now satisfied with the scope of discovery as to compensation data.

With regard to the Motion to Strike the Lau Declaration, and after consideration of the parties' arguments, the Court concludes that there is no dispute as to the accuracy of the spreadsheets that were prepared by Lau or under her direction, or by outside counsel, the details of which are set forth in the transcripts of the telephone conferences with counsel after the Motion to Strike the Lau Declaration was filed.  The accuracy of these spreadsheets has been accepted by both counsel, and they have been cited at different places in this Memorandum. These spreadsheets are the only documents in the record, which set forth the detailed compensation for both Fennell and his alleged comparators, which are relevant on certain aspects of the case.

Fennell has specifically stated that his pay discrimination claim is for the years 2015-2019, with the most relevant period being 2017-2018.  He specifically withdrew any claim that there was pay discrimination for the years 2020 and 2021, the compensation for which are shown on the spreadsheets.

The Court will therefore deny the Motion to Strike the Lau Declaration to the extent that it has led to the undisputed and relevant compensation data on the spreadsheets.

In view of Fennell's disclaimer of any claim of pay discrimination for the years 2020-2021, the Court will grant the Motion to Strike as to the data for those two years as to whether Fennell has stated a prima facie case for discrimination.

However, the Court believes that the 2020-2021 compensation data for SVPs Government Affairs, as well as the compensation data, including for non-Government Affairs SVPs, are relevant and probative on the issues of pretext and will deny the Motion to Strike the Lau Declaration as to that issue.

Therefore, the Court's Order will state that the Motion to Strike is granted in part and denied in part.

## IV.    Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" when "a reasonable jury could return a verdict for the nonmoving party."  Id.  At summary judgment, the Court's role is "'to determine whether there is a genuine issue for trial,' it is 'not . . . to weigh the evidence and determine the truth of the matter.'"  Peroza-Benitez v. Smith, 994 F.3d 157, 164

(3d Cir. 2021) (quoting <u>Baloga v. Pittston Area Sch. Dist.</u>, 927 F.3d 742, 752 (3d Cir. 2019)). The Court should grant summary judgment only if, "review[ing] the record as a whole and in the light most favorable to the nonmovant, drawing reasonable inferences in its favor," <u>In re Chocolate Confectionary Antitrust Litig.</u>, 801 F.3d 383, 396 (3d Cir. 2015), "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## V.   Discussion

### A.   Title VII Pay Discrimination on the Basis of Sexual Orientation[6]

Pursuant to Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. In 2020, the Supreme Court recognized that Title VII forbids discrimination on the basis of a person's sexual orientation. <u>Bostock v. Clayton Cnty.</u>, 140 S. Ct. 1731 (2020); <u>see</u> <u>Doe v. Catholic Relief Servs.</u>, -- F. Supp. 3d --, 2022 WL 3083439, at *4 (D. Md. Aug. 3, 2022) ("When an employer discriminates against an employee based on sexual orientation, 'it necessarily and intentionally discriminates against that individual in part because

---

[6] The PHRA and the PFPO are to be interpreted as identical to Title VII claims. <u>See</u> <u>Fogleman v. Mercy Hosp., Inc.</u>, 283 F.3d 561, 567 (3d Cir. 2002); <u>Joseph v. Continental Airlines, Inc.</u>, 126 F. Supp. 2d 373, 376 n.3 (E.D. Pa. 2000) (Joyner, J.). However, the PHRA does not explicitly prohibit discrimination on the basis of sexual orientation. <u>See</u> <u>Hawkins v. City of Phila.</u>, 571 F. Supp. 3d 455, 460 n.2 (E.D. Pa. 2021) (Rubreno, J.). Nonetheless, "a plaintiff is entitled to protection under the PHRA if discrimination suffered is based on gender stereotypes as it is considered sex-based discrimination." <u>Id.</u> (citing <u>Eure v. Friends' Central School Corp.</u>, No. 18-1891, 2019 WL 3573489, at *4 (E.D. Pa. Aug. 5, 2019) (Tucker, J.)) (internal quotations omitted). Both parties assert that all three should be viewed under the same framework, and the Court agrees.

of sex.  And that is all Title VII has ever demanded to establish liability.'") (quoting <u>Bostock</u>, 140 S. Ct. at 1744).

The Third Circuit has yet to rule, precedentially, on a Title VII claim on the basis of sexual orientation, let alone in the context of, as here, a disparate pay claim.  Nevertheless, and in light of Fennell's lack of direct evidence of discrimination, it is clearly appropriate to apply the <u>McDonnell Douglas</u> burden shifting framework to this context.  <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)); <u>Stanziale v. Jargowsky</u>, 200 F.3d 101, 105-06 (3d Cir. 2000); <u>Williams v. URS Corp.</u>, 124 F. App'x 97, 99 (3d Cir. 2005); <u>see also</u> <u>Taylor v. United Parcel Serv.</u>, 554 F.3d 510, 522-23 (5th Cir. 2008) (applying <u>McDonnell Douglas</u> to Title VII disparate pay claim); <u>Etheridge v. Novo Nordisk Inc.</u>, No. 19-13676, 2022 WL 1689910, at *1, 6-7 (D.N.J. May 26, 2022) (same, when the discriminatory conduct is based on plaintiff's sexual orientation); <u>cf.</u> <u>Summy-Long v. Pa. State Univ.</u>, 715 F. App'x 179, 182 (3d Cir. 2017) (in analyzing Title IX pay discrimination claim, applying Title VII framework pursuant to <u>McDonnell Douglas</u>).

Pursuant to <u>McDonnell Douglas</u>, to survive summary judgment, a plaintiff must first present a prima facie case of discrimination.  <u>See</u> <u>Mandel v. M&Q Packaging Corp.</u>, 706 F.3d 157, 169 (3d Cir. 2013).

"The central focus of the prima facie case is always whether the employer is treating some people less favorably than others" because of their protected status.  <u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797-98 (3d Cir. 2003) (internal quotations omitted).  The prima facie elements of a discrimination claim are "flexible and must be tailored to fit the specific context." <u>Bailey v. Millennium Grp. of Del.</u>, No. 21-1752, 2022 WL 3754617, at *2 (3d Cir. Aug. 30, 2022) (NPO) (citing <u>Sarullo</u>, 352 F.3d at 798)).  Generally, to establish a prima facie case of

sexual orientation discrimination, a plaintiff must show that: (1) he was a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) there are circumstances that support an inference of discrimination.  Id. (citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002)); see also Burton v. Teleflex, Inc., 707 F.3d 417, 426 (3d Cir. 2013) (quoting Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008)); Etheridge, 2022 WL 1689910, at *6-7.

The fourth element's inference of discrimination requirement can be established "in a number of ways."  Golod v. Bank of Am. Corp., 403 F. App'x 699, 702 n.2 (3d Cir. 2010) (NPO) (citing Swierkiewicz, 534 U.S. at 511-12).  For example, a plaintiff may point to "comparator evidence, evidence of similar . . . discrimination against other employees, or direct evidence of discrimination from statements or actions by [the plaintiff's] supervisors suggesting [discriminatory] animus."  Id. (citing Swierkiewicz, 534 U.S. at 511-12); see McFadden v. Whole Foods Market Grp., Inc., No. 19-1103, 2021 WL 736899, at *7 (E.D. Pa. Feb. 25, 2021) (Pratter, J.) ("A plaintiff may show circumstances giving rise to an inference of discrimination with any kind of relevant evidence[.]").  Comparator evidence includes showing that "a similarly situated individual outside of the protected class, who engaged in the same conduct but was treated more favorably."  Mandel, 706 F.3d at 170; see also Burton, 707 F.3d at 426; Etheridge, 2022 WL 1689910, at *6-8.  A plaintiff may also establish an inference of discrimination with the same evidence used to demonstrate pretext.  See McFadden, 2021 WL 735899, at *9 (citing Young v. Builders Steel Co., 754 F.3d 573, 578 (8th Cir. 2014) ("Although evidence of pretext is normally considered at the last step of the McDonnell Douglas analysis, pretext can also satisfy the inference-of-discrimination element of the prima-facie case.")); cf. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is

unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."); Burton, 707 F.3d at 427 ("[I[f a plaintiff has come forward with sufficient evidence to allow a finder of fact to discredit the employer's proffered justification, she need not present additional evidence of discrimination beyond her prima facie case to survive summary judgment. . . .  [T]he factfinder may infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an invidious reason.") (citing Fuentes v. Perskie, 32 F.3d 759, 764-65 (3d Cir. 1994) and Fasold v. Justice, 409 F.3d 178, 185 (3d Cir.2005)).

Once the plaintiff makes out a prima facie case, the burden shifts to the defendant to "articulate some legitimate non-discriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802.  "Determining pretext is a fact-based inquiry." Kautz v. Met-Pro Corp., 412 F.3d 463, 468 (3d Cir. 2005).  A defendant can satisfy this "relatively light burden" by "introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Etheridge, 2022 WL 1689910, at *6 (quoting Fuentes, 32 F.3d at 763).

If defendant meets its burden in step two, the burden shifts back to the plaintiff "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." Burton, 707 F.3d at 426 (quoting Fuentes, 32 F.3d at 764-65).  "[A] plaintiff must make this showing of pretext to defeat a motion for summary judgment." Id. at 427 (citing Doe v. C.A.R.S. Pro. Plus, Inc., 527 F.3d 358, 364 (3d Cir. 2008)).

**B.  Fennell Is Unable to Establish a Prima Facie Case of Pay Discrimination on the Basis of Sexual Orientation**

There is no dispute that Fennell has established the first three elements of his prima facie case.   Rather, Comcast challenges the fourth element—i.e., whether the circumstances surrounding his alleged pay discrimination support an inference of discrimination.  Fennell's failure to satisfy this element of his prima facie case is fatal to his pay discrimination claim.  Because Fennell fails to establish that similarly situated, non-LGBTQ+ employees at Comcast were treated more favorably, or that there are other circumstances giving rise to an inference of discrimination, the Court will grant summary judgment.

**1.      Fennell Has Failed to Show How "Similarly Situated" Employees Were Treated More Favorably**

A plaintiff may satisfy the fourth element of a prima facie case for Title VII discrimination by presenting evidence that similarly situated employees, outside of the protected class, were treated more favorably.  See Mandel, 706 F.3d at 170.  Whether an individual is "similarly situated" is a "fact-intensive inquiry" to be decided "on a case-by-case basis rather than in a mechanistic and inflexible manner," see Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 305 (3d Cir. 2004), and is typically not suitable for summary judgment, see Crawford v. Verizon Pa., Inc., 103 F. Supp. 3d 597, 605 (E.D. Pa. 2015) (Dalzell, J.).

"Similarly situated" does not mean identically situated; rather it means "similar[] . . . in all relevant respects."  Wilcher v. Postmaster Gen., 441 F. App'x 879, 881-82 (3d Cir. 2011) (emphasis added) ("Although this court has not explicitly stated what constitutes a similarly situated employee, we accept the standard used by other circuits that to be considered similarly situated, comparator employees must be similarly situated in all relevant respects."); see In re Tribune Media Co., 902 F.3d 384, 403 (3d Cir. 2018) (suggesting "similarly situated" persons

26

must be comparable in "all material respects") (quoting <u>Patterson v. Avery Dennison Corp.</u>, 281 F.3d 676, 680 (7th Cir. 2002)); <u>see also Doe v. Apria Healthcare Grp., Inc.</u>, 97 F. Supp. 3d 638, 645 (E.D. Pa. 2015) (Robreno, J.); <u>Etheridge</u>, 2022 WL 1689910, at *9.

A determination as to whether an employee is "similarly situated" generally takes into account "the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace."  <u>See</u> <u>Monaco</u>, 359 F.3d at 305; <u>Glasson v. Citizens Bank of Pa.</u>, No. 21-2321, 2022 WL 4077128, at *1 (3d Cir. Sept. 6, 2022) (NPO); <u>see also</u> <u>Wilcher</u>, 441 F. App'x at 882 (highlighting factors such as "the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in"); <u>Herster v. Bd. of Supervisors of La. State Univ.</u>, 887 F.3d 177, 185 (5th Cir. 2018) (looking to whether comparator employees held the same job responsibilities and duties); <u>Bio v. Fed. Express Corp.</u>, 424 F.3d 593, 597 (7th Cir. 2005) (considering "relevant factors" to include whether the employees "held the same job description," "were subject to the same standards," "were subordinate to the same supervisor," "had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision"); <u>Doe</u>, 97 F. Supp. 3d at 645 (looking to whether the comparator employees "have essentially comparable violation histories").

i.      **Summary of Fennell's Alleged Comparators, as well as Rick Smotkin, in the Light Most Favorable to Fennell**

Fennell has introduced five (5) SVPs Government Affairs that he alleges to be "similarly situated"—B.M., G.J., G.T., R.M., and M.C.  Comcast has presented another SVP Government Affairs, Rick Smotkin, that it alleges Fennell ignored in his comparator analysis.  Fennell disputes Smotkin as a proper comparator.

Each individual's position at Comcast, to include their job responsibilities, are summarized below, based on the evidence in the record taken in the light most favorable to Fennell.

### a. Rick Smotkin

As SVP Government Affairs, from 2015 to his separation in 2017, Smotkin also reported to Perkins.  Def.'s SUF ¶ 108; Pl.'s Resp. to Def.'s SUF ¶ 108.  Smotkin's responsibilities included "working on international issues for film tax credits for NBC Universal, promoting the Golf Channel network, attending intergovernmental association meetings, and lobbying and networking with attorney generals."  Pl.'s Counterstatement ¶ 23.  Smotkin did not have any external affairs-related responsibilities, and he did not have a law degree.  Id. at ¶¶ 25-26.  He had two direct reports.  See id. at ¶ 24.  According to Comcast, Smotkin had the same amount of budgetary responsibility and authority as Fennell, see Def.'s SUF ¶ 110; although Fennell disputes the extent to which Smotkin had budgetary responsibility and/or authority, see Pl.'s Resp. to Def.'s SUF ¶ 110, Fennell presents no facts or cites to the record that counter Comcast's assertion.

Smotkin had "difficult relationships with numerous colleagues" at Comcast, and Comcast gave him multiple "coachings."  Pl.'s Counterstatement ¶¶ 27-29.  Additionally, Smotkin's supervisor, Perkins, became "unsatisfied with [Smotkin's] performance and had concerns about the ethics of [his] business dealings carried out on [Comcast's] behalf."  Id. at ¶ 30.  In 2017, Comcast terminated Smotkin.  Id. at ¶ 32.  Following Smotkin's termination, Smotkin's position was retitled to Vice President of Local Advocacy and Intergovernmental Affairs.  Id. at ¶ 33.

### b.      B.M.

B.M., who, like Fennell, has a college and law school degree, has worked at Comcast for approximately seventeen (17) years.  Id. at ¶¶ 37-39.  He became SVP Government Affairs in 2015.   See DEF-010495-96.   Like Fennell, B.M.is based at Comcast's Headquarters in Philadelphia, maintains responsibilities that cover Comcast's entire geographic footprint, shares oversight over Perkins' Headquarters' Government Affairs budget, and does not have independent budgetary authority.  Pl.'s Counterstatement ¶¶ 40-43.  B.M. has one (1) direct report.  Id. at ¶ 44.

### c.      G.J.

G.J. was promoted to SVP Government Affairs in 2014.  Def.'s SUF ¶ 96; Resp. to Mot. for Summ. J., Ex. B ("Fennell Depo.") 189:5-8.  His position focuses on "policy and strategy for [Comcast's] interactions with state legislatures and state executives."  Fennell Depo. 189:14-190:3; see also Fennell Depo. 98:15-99:4 (stating that G.J. works in state government affairs). He had two direct reports, and reported to Zachem.  See Fennell Depo. 99:11-100:4.

### d.      R.M., G.T., and M.C.

R.M. and G.T. have been SVPs Government Affairs since at least 2010, and M.C. has held the title since 2015.  See DEF-010495-96.  Unlike Fennell, all three serve as SVPs Government Affairs of their respective divisions.  See Def.'s SUF to Pl.'s Counterstatement ¶ 40.

R.M., during his deposition, described the Division SVP Government Affairs role as having responsibility for certain government affairs functions within their respective Division, such as:

> local government affairs, which includes interactions with local
> governments related to franchise agreements and fees required by
> local governments in order to use public property to provide
> services to customers; and state legislative and regulatory Affairs,
> which includes interaction with the state legislature, the governor's
> office, the state attorneys general office, the department of
> revenue, and the state public utilities commission.

Def.'s SUF ¶ 82 (citing Mot., Ex. 18 ("R.M. Depo.") 20:1-36:4; see Pl.'s SUF ¶ 82.

G.T., formerly Central Division Senior Vice President, was responsible for government affairs, community impact, and communications for the Central Division.  See Def.'s SUF ¶ 84; Pl.'s Resp. to Def.'s SUF ¶ 84; Fennell Depo. 192:25-193:8 ("[H]e led government regulatory community impact and communications for [the Central Division], [which] includes four regions: the Florida region, the Big South region, . . . the Greater Chicago region, and the Heartland region.").  His "most important job duty" was "to provide the Government Affairs and Regulatory and External Affairs perspective to the division president and the division president's leadership team as they were making decisions about how [Comcast] execute[s] [its] business." Fennell Depo. 194:12-21.  He had approximately five direct reports, and reported to then President of the Central Division.  Id. at 194:22-24; 197:10-12.

R.M., Northeast Division Senior Vice President, is responsible for:

> public relations, which includes interacting with all traditional
> media outlets within the Division, such as newspapers, broadcasts,
> and social media; internal employee communications and
> messaging for Division employees; digital media services, which
> includes videography for employee webinars, public service
> announcements, etc.; strategic initiatives, such as expansion
> efforts; community investment, which includes working with
> Comcast Foundation to invest in community-based enrichment
> initiatives; and "other duties" as may be assigned by the Division
> President.

Def.'s SUF ¶ 85; Pl.'s Resp. to Def.'s SUF ¶ 85; see also R.M. Depo. 16:8-17 (in comparing his position to Perkins, stating that "[Perkin's] scope of work is very different than mine. So think of

it as span of control, if you will.  So the span of control in the number of employees that I have is different than Bret.  And the span of control that I have for subject-matter areas that I oversee and I have a budget for and I have direct report employees, I have many more areas I oversee than Bret.").  His supervisor is a Division President.  <u>See</u> Fennell Depo. 197:4-6.

M.C., West Division Senior Vice President, is responsible for government affairs, regulatory affairs, community impact and communications.  <u>See</u> Def.'s SUF ¶ 86; Pl.'s Resp. to Def.'s SUF ¶ 86; <u>see also</u> Fennell Depo. 195:4-19; 196::10-15.  He supervises five (5) people. <u>See</u> Fennell Depo. 196:10-15.

### ii.      Parties' Arguments

Comcast argues that Fennell is unable to provide a prima facie case of sexual orientation discrimination because his alleged comparators— G.J., B.M., G.T., R.M., M.C.—are not "similarly situated" to him.  Mot. for Summ. J. 10.  According to Comcast, while some of the alleged comparators share the same job title as Fennell, that alone is not dispositive because the jobs "fall in different business units from Mr. Fennell's, with very different challenges and focus, and each of them have broader job duties than Mr. Fennell within their business units."  <u>Id.</u> Comcast argues that the alleged comparators report to different supervisors and decision-makers, and they have different supervisory and budgetary authority compared to Fennell.  <u>Id.</u> at 10-11. Additionally, Comcast suggests that Fennell's most apt comparator is Smotkin, "whose role was similar [to Fennell's] with respect to job title, reporting line, timing of promotion to Senior Vice President, supervisory responsibility, budget responsibility, and scope of job duties."  <u>Id.</u> at 17 ("Mr. Fennell seeks to have it both ways: any Senior Vice President with Government Affairs responsibilities should be considered similarly situated, unless of course—like Mr. Smotkin—the comparison does not serve his narrative.").

Fennell counters that he undisputedly has been paid less than every other SVP Government Affairs, all of whom are heterosexual.  Resp. 8.  Fennell argues Comcast's position that none of the alleged five (5) comparators are "similarly situated" leads to the illogical conclusion that he is "not similarly situated to a single one of [Comcast's] 83,999 other current employees[.]"  Id. at 10.  As to Comcast's argument that Smotkin is "similarly situated," Fennell contends that Smotkin cannot be a comparator because he involuntary left Comcast in 2017 and otherwise had less experience, qualifications, and job responsibilities than Fennell.  Id. at 12-13.  Fennell further suggests that there is an inference of discrimination based on Comcast's comparator analysis, given that it highlights all of the diversity initiatives that Comcast undertakes but simultaneously "reduce[s]" the scope and value of Fennell's work for Comcast's LGBTQ+ initiatives.  Id. at 14.

### iii. Analysis

At the outset, compensation programs for high-level executives at companies are complex mechanisms.  See, e.g., Executive Compensation Guide, 100.10 Introduction to Executive Compensation ("Executive compensation has become a complex multi-dimensional puzzle, fraught with high stakes and the likelihood of public scrutiny and second-guessing.").  Comcast's compensation program is no exception.  The gross compensation that a high-level executive at Comcast, such as Fennell, receives per annum is dependent upon: (1) base pay; (2) annual bonus target percentage; (3) annual bonus target amount; and (4) annual management grant target amount.  See, e.g., DEF-010495.  What an employee is assigned for each of the four aforementioned categories depends on a number of different factors, to include job title, job responsibilities, operational budgetary responsibility, external and/or external facing responsibilities, and managerial responsibilities.

Although whether an employee is "similarly situated" is usually a fact-intensive inquiry reserved for a jury, this does not negate a plaintiff's burden at summary judgment to establish the fourth element of a prima facie Title VII pay discrimination case:  that there are circumstances that support an inference of discrimination.  In other words, it is Fennell's burden, when relying on comparator evidence, to introduce "similarly situated" individuals and show how those comparators were treated more favorably by Comcast.  Fennell points to alleged comparators that share his job title yet earn a higher gross compensation than him.  But this evidence of a pay disparity between him and his alleged comparators, without more, is insufficient to establish that these non-LGBTQ+ individuals were treated more favorably than Fennell.

### a.   Fennell Has Failed to Establish How M.C., G.T., or R.M. Are "Similarly Situated"

Fennell points to M.C., G.T., and R.M. as comparators who have shared a SVP Government Affairs job title with Fennell.  Yet Comcast has produced evidence that M.C., G.T., and R.M. have had considerably broader job responsibilities and a different compensation determination process, compared to Fennell, due to their status as <u>Division</u> SVPs Government Affairs.  Fennell agrees that these three individuals are Division SVPs Government Affairs, <u>see</u> Pl.'s Resp. to Def.'s SUF ¶¶ 84-86, however he disputes whether the "division" label affixed to their positions results in them having a broader scope of job responsibilities and different compensation determinations, as compared to Fennell, <u>see</u> <u>id.</u> at ¶¶ 87-94.

Fennell fails to provide any record support for his contentions about Division job responsibilities.  <u>See</u> <u>id.</u>  He points to no facts, in his Counterstatement of Facts or otherwise, to support even an inference that these three individuals have relevant job similarities to qualify as comparators to Fennell.  Likewise, he presents no argument in his response brief as to why the

Court should consider these three individuals as comparators, aside from them sharing a job title. He concedes that job title alone is "not dispositive."  See Resp. 9-10; Monaco, 359 F.3d at 305; see also In re Tribune Media Co., 902 F.3d 384, 403 (3d Cir. 2018) (holding two employees—one a seasonal, non-union employee, and the other a full-time union employee who had been with the employer for decades—were not "similarly situated" as they had different tenures and statuses); Cagnetti v. Juniper Village at Bensalem Ops., No. 18-5121, 2020 WL 4039027, at *10 (E.D. Pa. July 17, 2020) (Leeson, J.) ("The fact that two employees share a job title is insufficient by itself to support an inference that they are suitable comparators. . . .  Typically there must also be evidence that the employees 'were subject to the same standards and compensation scheme, or had comparable experience, education, or qualifications.'") (quoting Reid v. Wal-Mart Stores, Inc., 274 F. Supp. 3d 817, 823 (N.D. Ill. 2017) and Tank v. T-Mobile USA, Inc., 758 F.3d 800, 810 (7th Cir. 2014)); cf. Mandel, 706 F.3d at 170 ("[A]n employee who holds a different job in a different department is not similarly situated.") (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 358–59 (3d Cir. 1999)).

A lack of evidence in the record does not create a genuine dispute of material fact; it is simply a lack of evidence.  It is Fennell's burden to show how these three Division SVP Government Affairs, aside from having the same job title, are "similarly situated" to him.  He has failed to do so.

### b.    Fennell Has Failed to Establish How G.J. Is "Similarly Situated"

Fennell's argument as to G.J. being "similarly situated" likewise fails.  Aside from showing that G.J. shares with Fennell the same job title, Fennell has presented no evidence, and

countered with no argument, in support of a finding that G.J. has the relevant job similarities to Fennell to qualify him as a comparator.[7]  See, e.g., Pl.'s Resp. to Def.'s SUF ¶¶ 96-103.

### c.     Fennell Has Failed to Establish How B.M. Is "Similarly Situated"

According to Fennell, B.M. is a "particularly apt comparator" and is "alike in all relevant respects."  Resp. to Mot. for Summ. J. 10-12.  In support, Fennell points to the following facts: (1) they each have a college degree and law degree; (2) they have been employed by Comcast for approximately two decades, with B.M. being there a few years less; (3) they were promoted to SVP Government Affairs around the same time, with both promotions endorsed by Zachem; (4) they are based out of Comcast's Philadelphia Headquarters; (5) their job responsibilities encompass Comcast's entire business footprint; (6) B.M. has one (1) direct report, while Fennell has two (2); (7) they share budgetary oversight over the same budget "owned" by Perkins; (8) Lau, Cohen, and Zachem have played a role in setting their compensation; and (9) they both have a "dotted line reporting relationship" to Zachem.  Id. at 10-11.

Comcast argues that B.M. is not a comparator because, inter alia, (1) B.M. has independent budget authority; (2) they report to different supervisors; and (3) B.M.'s work involves "matters of greater significance to the company because statewide developments have greater potential for serious financial impact on the business than the action of a particular municipality, which would be within Mr. Fennell's purview."  See Mot. for Summ. J. 14-15 (citing Def.'s SUF ¶¶ 97-98); see also Reply 5-9.  Fennell argues in response that the record

---

[7]     Fennell claims that Comcast's Human Resources identified G.J. and B.M., as well as R.M., M.C., and G.T., as Fennell's "proper pay comparators."  See Pl.'s Counterstatement ¶ 78. Yet who Comcast's Human Resources characterizes as "comparators" is not conclusory to a court's determination as to who qualifies, legally, as a comparator pursuant to McDonnell Douglas.

supports none of Comcast's arguments, and it is a question of fact as to whether the two are comparators.  <u>See</u> Resp. to Mot. for Summ. J. 12.

Although true that the comparator issue is typically a question of fact reserved for a jury, <u>see</u> <u>Monaco</u>, 359 F.3d at 305, Fennell again has failed to satisfy his burden in establishing that B.M. is similar in all relevant respects.  All proposed comparators and Fennell are undisputedly part of Comcast's senior-level executive compensation mechanism, and their gross compensation is a summation of different calculations, to include base pay, bonus target, bonus amount, and management grant target, where the precise value of each is determined by a group of executives based on a complex formulation that, according to Fennell, has "no uniform process."  Pl.'s Counterstatement ¶ 99.

Several Comcast executives testified as to how Comcast determines compensation for SVPs Government Affairs, pointing to factors such as level of "remit," business title, the number of employees managed, the nature of the role, and budgetary responsibility.  <u>See</u> <u>supra</u> Section II.D.  Fennell disputes the extent to which any of these factors have a role in SVP Government Affairs compensation determinations, but he provides no evidence to counter Comcast's assertions, which are supported in the record.

Again, Fennell's reliance on a lack of evidence in the record, or a lack of "uniform" compensation process, to get by summary judgment is not allowed or persuasive.  The determinations that went into B.M.'s and Fennell's gross compensation formulation, to include the underlying pay, bonus, and management grant determinations, are relevant to determining whether the two are "similarly situated."  It is Fennell's burden to establish that the B.M. and Fennell are similar in all relevant, or material, respects.  Without pointing to evidence as to the nature of these determinations, Fennell has not met this burden, and no reasonable jury could

conclude that there was an inference of discrimination in determining gross compensation.  This is fatal to his claim that B.M. is a comparator.[8]

### d. Even if Smotkin Is a Proper Comparator, Fennell Has Failed to Show How Smotkin Was Treated More Favorably Than Him

Fennell vehemently opposes that Smotkin is "similarly situated" to him, and the Court need not address this argument conclusively, one way or another, because, even if Smotkin qualifies as a comparator, Fennell has failed to establish how Smotkin was treated more favorably.  As to the most relevant period of Fennell's claim, 2017-2018, Smotkin was paid more than Fennell in 2017, and he was no longer at Comcast in 2018.  From 2015 to 2016, Fennell's gross compensation was essentially equal to Smotkin's.  That said, the Court notes that a plaintiff may not selectively choose some comparators while ignoring others.  See Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998) (holding that a Title VII plaintiff "[cannot] pick and choose a person she perceives is a valid comparator who was allegedly treated more favorably, and completely ignore a significant group of comparators who were treated equally or less favorably than she").

* * * * *

In sum, Fennell has failed to establish that non-LGBTQ+ employees similarly situated to him were treated more favorably.  This is not to say that Fennell has no comparators.  But under this record, there is no evidence to support Fennell's characterization that the individuals discussed above are comparators.  Viewing the facts in the light most favorable to Fennell,

---

[8]    In the alternative to the arguments addressed in supra Sections V.B.1.iii.a-b this reasoning also applies to why the other alleged comparators— G.T., R.M., M.C., and G.J.—are not "similarly situated."

Fennell has failed to establish a prima facie case of pay discrimination.  No reasonable jury could conclude to the contrary.

### 2. In the Alternative, Plaintiff's Stated "Background Evidence" Is Not Enough to Support an Inference of Discrimination

Fennell argues that the historical instances of discrimination that he has faced while employed at Comcast serve as "background evidence" to support an inference of discrimination. Resp. to Mot. for Summ. J. 15-17.  But the circumstances that Fennell points to are insufficient to support an inference of discrimination, for the same reasons that his pretext argument fails— i.e., there is no discriminatory animus.  See infra Section V.D (citing Fuentes, 32 F.3d at 764 and Ezold, 983 at 543-48; see also McFadden, 2021 WL 735899, at *9; cf. Reeves, 530 U.S. at 147; Burton, 707 F.3d at 427.

### C. Comcast Has Proffered a Substantive, Non-Discriminatory Reason for the Pay Disparity

Because Fennell has not established a prima facie case, there is no need for the Court to consider the remaining steps of the McDonnell Douglas framework.  Nevertheless, even if Fennell has presented a prima facie case of pay discrimination, Comcast has come forth with substantive, non-discriminatory reasons for why Fennell's gross compensation was set as it was—i.e., the steps, determinations, and considerations that go into setting high-level executive gross compensation.  See Mot. for Summ. J. 18.  These reasons are discussed throughout the opinion.

Therefore, the Court next turns to whether Fennell has met his burden to show pretext.

**D. Even If Fennell Could Make a Prima Facie Showing, There Is Insufficient Evidence Showing Comcast's Explanation Is Pretext for Unlawful Discrimination**

Pursuant to the McDonnell Douglas framework, the burden now shifts back to Fennell to provide evidence from which a factfinder could reasonably infer that Comcast's proffered reasons are pretextual. Pursuant to the following analysis, Fennell has failed to show pretext.

### 1.   Evaluating Pretext at Summary Judgment

To avoid summary judgment once an employer has offered a substantive, non-discriminatory reason for the adverse action, a plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764; Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 543-48 (3d Cir. 1992); see also Burton, 707 F.3d at 430 ("A plaintiff may demonstrate pretext at summary judgment in two different ways. First, the plaintiff may point to evidence in the record that would cause a reasonable juror to disbelieve the employer's articulated legitimate non-discriminatory reason, thereby creating a genuine dispute of material fact as to the credibility of that reason. If a plaintiff comes forward with evidence that would cause a reasonable factfinder to find the defendant's proffered reason 'unworthy of credence,' she need not adduce any evidence of discrimination beyond her prima facie case to survive summary judgment. Second, the plaintiff may also defeat summary judgment by pointing to evidence that indicates that the employer acted with discriminatory animus.")

"To discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765 (emphasis added). The plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." Id. (citations and internal quotations omitted).

###        2.        Parties' Arguments

According to Fennell, there is "ample evidence from which a reasonable jury could either disbelieve Defendants' stated justification for the pay disparity or believe that Defendants' compensation decisions were motivated by Plaintiff's sexual orientation." Resp. to Mot. for Summ. J. 18. Fennell points to approximately twenty-three (23) instances of alleged discriminatory conduct that he has experienced during his employment at Comcast, which he believes provides "background evidence" of Comcast's "demonstrated history of perpetuating and tolerating sexual orientation-based discrimination. Id. at 24-26; see supra Sections III.B-C (listing instances). According to Fennell, this "background evidence of discrimination . . . all of which is undisputed by Defendants . . . readily supports a finding that Defendants' various compensation decisions which resulted in Plaintiff being paid significantly less (in many cases several hundred thousand dollars annually) than all other Senior Vice Presidents of Government Affairs was motivated by Plaintiff's sexual orientation." Resp. to Mot. for Summ. J. 25-26. Fennell also argues that summary judgment is improper on pretext grounds because the testimony that Comcast relies on as to its compensation determinations is inconsistent and subjective, and Comcast has not produced "a single piece of contemporaneously maintained evidence demonstrating that the cited distinctions between [him] and the other SVPs of

Government Affairs <u>actually</u> motivated any compensation decision impacting [him]." <u>Id.</u> at 19-23. Finally, he contends that Comcast's decision to increase Fennell's annual bonus target in 2018 following the filing of his Internal Complaint "alone demonstrates [and/or] casts doubt on the veracity of Defendants' states reason for compensating" Fennell less than other SVPs Government Affairs. <u>Id.</u> at 24.

Comcast counters that Fennell cannot show that Comcast's explanation for the pay disparities between him and his alleged comparators is pretext. Reply 10-11. Comcast argues that it has "the discretion to exercise business judgment about the relative importance of different government affairs activities, to determine the relevant criteria for how to value those activities, and to apply the criteria so long as those are applied in a non-discriminatory fashion." <u>Id.</u> at 11. Comcast also maintains that Fennell has failed to carry his burden to show pretext on the grounds that: (1) Comcast is not required to provide specific written documents to show why it pays one executive more than another for dissimilar jobs; (2) any suggestion of subjectiveness is "simply a restatement of [Fennell's] dissatisfaction with Comcast's relative weighing of the significance of his and [B.M.'s] roles"; (3) Comcast's explanation for how it determined Fennell's pay has been consistent; (4) the increase to Fennell's bonus target is "evidence of a company seeking to ensure it treated [Fennell] fairly, not the converse; and (5) Fennell's "background evidence" is irrelevant, attenuated, or simply does not suggest bias on the basis of sexual orientation. <u>Id.</u> at 11-17. Relying on the Lau Declaration, Comcast also argues that the wide range in compensation between SVPs Government Affairs, and SVPs in other departments, confirms that "a variety of business factors" go into determining SVP compensation range. <u>Id.</u> at 12-14.

3.      **Analysis**

Discriminatory animus is a common phrase in Third Circuit jurisprudence as a foundation concept often relied upon to support a successful employment discrimination claim.  See Fuentes, 32 F.3d at 765; Burton, 707 F.3d at 430-31.  Despite the lengthy factual materials in contention submitted by Plaintiff in opposing Comcast's Motion for Summary Judgment, the Court cannot conclude that Plaintiff has satisfied the well-settled requirement of presenting evidence to allow a jury to conclude that Comcast had any "discriminatory animus" towards Plaintiff, or Comcast's proffered legitimate reasons for the pay disparity was otherwise "unworthy of credence."

Fennell's argument as to pretext fails because he has not shown that Comcast's reliance on its compensation mechanism for senior-level executives was merely a pretext to cover a discriminatory animus.

As an initial matter, and as Comcast clearly sets out in its Reply, the record simply does not support Fennell's suggestion that the executives responsible for determining the compensation of Fennell, and other SVPs Government Affairs, testified inconsistently regarding Comcast's executive compensation mechanism.  For example, Cohen, Lau, and Zachem testified to the following:

| Name | Testimony | Record Cite |
|------|-----------|-------------|
| Cohen | A. So I don't know whether I noticed it when I was looking at this page, but I certainly knew that Mr. Fennell received lower compensation than senior vice presidents in the cable division who had vastly larger areas of responsibility and larger numbers of employees reporting to them and multiple areas of jurisdiction beyond government affairs, including communications and community affairs. **And it is -- and basically they were employees who were not even remotely comparable to the scope of responsibilities that Mr. Fennell had, which is why I said that they would definitely not be comparators to Mr. Fennell for** | 53:18-54:13 |

| | compensation purposes. | |
|---|---|---|
| Lau | A. I already explained. **It's the remit. It's operational budgetary responsibility.  It's the size of their team. It's whether they are external facing, internal facing.  We have, we have similar circumstances with other functions.  You know, I am aware, I am not paid identically to all of the other SVP's of human resources at Comcast, and I would say the same thing about the SVP's within financing.** Q. In your experience, or based on whatever data you are relying on to have just given that testimony, have you noticed a $[REDACTED] a year difference in the base salary of SVP's before? A. Certainly. Q. Certainly, is that your testimony? A. Absolutely. | 194:10-195:9 |
| Zachem | A: I looked at Klay's compensation, total package relative to his responsibilities, performance, number of people that he managed, who he reported to.  Every time I was asked to look at it, and I felt he was compensated fairly in the group relative to his title. | 35:17-23 |

Reply 13.

Additionally, even if there are inconsistencies in the ways in which Comcast set its executive compensation—which, again, is a position that the Court disagrees with—Fennell points to no evidence suggesting that these so-called inconsistencies could lead a reasonable factfinder to rationally find Comcast's proffered reasons "unworthy of credence" and hence infer that it did not act in line with its proffered, non-discriminatory reason.  Fuentes, 32 F.3d at 764-65.  Rather, Fennell testified as to having been treated with respect by Perkins, who was his supervisor and had a role in setting his compensation.  See, e.g., Fennell Depo. 68:3-77:19.  And despite having disagreements and thinking that Perkins sometimes acted "tone deaf," for example, in reference to the outside professional development group telling Fennell in 2002 that he was "too gay" for Comcast, see Fennell Depo. 69:11-71:6, Fennell testified that he did not think that Perkins intentionally discriminated against him, see id. at 72:7-16.

Similarly, Cohen—formerly Comcast's Senior Executive Vice President and Chief Diversity Officer—testified to the following when asked about Fennell:

> Q. Mr. Cohen, this is likely the easiest question I will ask you all day: You know Klay Fennell; correct?
>
> A. I know Klay Fennell. I respect Klay Fennell. I'd like to think that I'm a friend of Klay Fennell's. I've enjoyed working with him. He's a high performing employee at Comcast. He has done a terrific job in advancing the diversity agenda at the company with respect to gay, lesbian and transgender employees. And he's done a terrific job in the substance of his job, which is not the easiest job in the world. I have enjoyed working with him. I have respected the quality of his work, and I'm very appreciative for the hard work he has put in and for the way in which he has advanced the interests of the company through the execution of his job responsibilities.

Resp. to Mot. for Summ. J., Ex. D ("Cohen Depo.") 14:21-15:14. Fennell disputes that Cohen's statement suggests anything more than Cohen's own view of him. See Resp. to Def.'s SUF ¶ 13. But Fennell testified that his relationship with Cohen was "positive" to "neutral." See Fennell Depo. 116:21-25; see also id. at 117:18-21 (testifying that he viewed Cohen's support of him in the workplace as "neutral"). As one of the individuals tasked with determining his compensation, Cohen's testimony as to his own, subjective views of Fennell is an important part of the analysis as to whether there exists an inference of discriminatory animus. Viewing the facts in the light most favorable to Fennell, there is nothing suggestive of discriminatory animus on the part of Cohen or any other executive involved in his compensation determination, to include Lau and Zachem. See, e.g., id. at 114:5-9 (Q: . . . [D]o you consider Ms. Zachem to have been supportive of you in the workplace? A: I think she values my work. Yes."); 123:20-124:8 (Q: . . . Can you describe your relationship with [Lau]? A: I would say it is a -- um, it lacks a -- it lacks a personal, um – it's very -- um, it -- it – it's very formal. Um, um, it's very formal and seemingly forced. Q: Do you know if that's how she is with everyone? A: Um, that seems to be

many folks' impression that I speak with.  Q: Okay. And do those include persons who are not, you know, LGBTQ?  A: Yes.").

The "background evidence" argument that Fennell relies upon as showing pretext likewise is not persuasive.  Viewing the facts in the light most favorable to Fennell, there is no evidence that any of these listed incidents had any role in Fennell's compensation determination, and no reasonable jury could infer from them discriminatory animus behind Comcast's determination of Fennell's compensation.  Similar to the criticisms addressed by the Third Circuit in Fuentes, the majority of incidents that Fennell raises are no more than the "schoolground retort, 'Not so,'" which itself "does not create a material issue of fact."  Fuentes, 32 F.3d at 766-67.  These types of "schoolground retorts," for example, not getting invited to meetings, being left off emails, having performance reviewed, being taken down from the website, or not receiving a backfill immediately, happen in every workplace across the country, every day.  To be sure, such incidents could show pretext if a plaintiff connects them to a discriminatory animus motivating the employer's adverse employment action.  But Fennell has not done so here.  See, e.g., Ezold, 983 F.2d at 544-45.

Fennell also cites to incidents where he was deemed "too gay" and called a f****t— comments that the Court views as discriminatory on their face.  However, "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  Ezold, 191 F.3d at 545.  A comparison to the Third Circuit's decision in Ezold is instructive.  In Ezold, the Third Circuit—in evaluating a plaintiff's Title VII claim that a law firm discriminated against her on the basis of sex by deciding not to admit her to the firm's partnership—acknowledged that "crude and unprofessional" comments that were allegedly made about the plaintiff's sex may be

"inappropriate" and "reflect unfavorably on [the speaker's] personality or views." Id at 547. However, the Third Circuit concluded that "[i]f [it] were to hold that several stray remarks by a nondecisionmaker over a period of five years . . . were sufficient to prove that [the firm's] associate evaluation and partnership admission process were so infected with discriminatory bias that such bias more likely motivated [the firm's] promotion decision than its articulated legitimate reason, we would spill across the limits of Title VII." Id.

The same is true here. The comments made to Fennell are undoubtedly crude, unprofessional, and inappropriate, but they were made over fifteen years ago by persons who, as the record reflects, have had no role in Fennell's compensation determination. Without more, the inferential leap from these isolated incidents to Fennell's compensation determination is too attenuated to support a showing of pretext. Likewise, comments to Fennell about his hair, dress, and appearance, to include comparing him to Johnny Weir, made by individuals with no role in Fennell's compensation determination, may constitute microaggressions entirely inappropriate for the workplace.[9] But again, these incidents, without evidence linking them to Fennell's compensation determination, cannot support a showing of Title VII liability on the part of Comcast. See Ezold, 983 F.2d at 544-47; see also Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 359 (3d. Cir. 1999) (holding that certain "insensitive remarks" could not support a finding of Title VII liability because the remarks did not give rise to an inference of unlawful discrimination); Kargbo v. Phila. Corp. for Aging, 16 F. Supp. 3d 512, 523-24 (E.D. Pa. 2014) (Baylson, J.) ("To determine whether a statement can constitute overt evidence sufficient to

---

[9]     A microaggression is a "comment or action that subtly and often unconsciously or unintentionally expresses a prejudiced attitude toward a member of a marginalized group[.]" Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/microaggression (last visited Sept. 16, 2022).

show . . . a discriminatory animus towards older employees[,] the Third Circuit considers whether the speaker was a decisionmaker, the content of the statement and whether the statement was related to the decisional process.") (internal quotations omitted); cf. Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) ("[S]tray remarks in the workplace, while perhaps probative of sexual harassment, cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard.") (emphasis added).

Similar reasoning applies to Fennell's statement that Cohen called him "high pitched"; although made by one of his compensation decisionmakers, there is no evidence that this comment was related to the compensation decision process, and it is does not amount to a genuine dispute of material fact.[10]  See Price Waterhouse, 490 U.S. at 277.

Additionally, Comcast's decision to raise Fennell's bonus target does not suggest liability on the part of Comcast, nor does Comcast's lack of a written, uniform procedure for determining senior-level executive compensation.  Again, Fennell points to no evidence connecting these actions to a discriminatory animus.  Without any evidence suggestive of discriminatory animus, Comcast cannot be held liable under Title VII for the manner in which it chooses to operate is business.

---

[10]     To the extent that Fennell relies on Zachem's alleged "grow up/stop the antics" comments in support of his pretext argument, this comment was allegedly made following Fennell's submission of his Internal Complaint.  Additionally, there is nothing in the record as to whether this statement was made in the context of his sexual orientation, see Lau Depo. II 259:4-8, 261:15-22; Pl.'s Counterstatement ¶ 91-92 (Lau testified that the "antics" referred to Fennell's failure to collaborate with Smotkin, and that she did not know what behavior led to Zachem suggesting that Fennell needed to "grow up"), and it appears that Fennell's counsel did not even ask Zachem during her deposition what she meant by these comments.

Finally, while subject to the Lau Declaration discussed in Section III.C, the compensation data that Comcast submitted is further evidence that Fennell has failed in showing pretext.[11]  The Court cannot make any inference from the data and spreadsheets submitted that there is an underlying discriminatory animus motivating Comcast to pay Fennell less than other SVPs. Rather, it shows that SVPs at Comcast—in Government Affairs or otherwise—receive a considerably wide range of salaries, which, as several Comcast executives testified to, are determined based on a number of non-discriminatory factors.  On this evidence, there is nothing from which a reasonable jury could conclude that Comcast's executive compensation mechanism is based on a discriminatory animus.  And as noted in <u>supra</u> Section III.C.3, Fennell no longer asserts that the new data submitted is relevant to his claim.

* * * * *

As discussed above, a lack of evidence does not equate to a genuine dispute of material fact.  And Fennell's clear dissatisfaction with Comcast's compensation mechanism, without evidence of discriminatory animus, cannot form the basis of a Title VII pay discrimination claim. Fennell was and continues to be embraced within Comcast as a respected employee at a high salary.

### E.  Plaintiff's Claim of Retaliatory Hostile Work Environment Fails

#### 1.      Elements of a Retaliatory Hostile Work Environment Claim

A plaintiff's right to bring a retaliatory hostile work environment claim under Title VII's antiretaliation provisions is well established.  Title VII's private-sector antiretaliation provision prohibits an employer from "'discriminat[ing] against' an employee . . . because that individual

---

[11]      For the reasons previously discussed, Fennell's pretext argument fails, even without a reliance on the Lau Declaration.

'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation."  Burlington N. & Santa Fe. Ry. Co. v. White, 548 U.S. 53, 56 (2006) (quoting 42 U.S.C. §2000e-3(a)).  "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  Id. at 67.

To establish a retaliatory hostile work environment claim, a plaintiff must prove:

> (1) She suffered intentional discrimination because of her protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.

Komis v. Sec'y of U.S. Dep't of Labor, 918 F.3d 289, 293 (3d Cir. 2019) (citing Jensen v. Potter, 435 F.3d 444 (3d Cir. 2006)).

Pursuant to Burlington Northern, a private sector plaintiff bringing a claim under Title VII's antiretaliation provision must also show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern, 548 U.S. at 68 (emphasis added) (internal quotations omitted); see also Komis, 918 F.3d at 298 (following Burlington Northern, the Third Circuit in Komis reiterated the application of the usual discriminatory hostile work environment legal framework for hostile work environment claims based on retaliation, pursuant to Jenson, while recognizing that Burlington Northern mandates a "materially adverse" requirement for discrete retaliation claims in the private sector).  The "materially adverse" requirement, which is an objective measure, "separate[s] significant from trivial harms," an important distinction because:

> [Title VII] does not set forth a general civility code for the American workplace.   An employee's decision to report

discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.   The antiretaliation provision seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms.   It does so by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers.   And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.

Id. (internal quotations and citations omitted); see also Moore v. City of Phila., 461 F.3d 331 (3d Cir. 2006) (applying Burlington Northern's "materially adverse" requirement to a retaliation claim brought by police officers against certain supervisors).

The Third Circuit has yet to address the extent to which, if any, there is an overlap in analysis between the "severe or pervasive" and "materially adverse" requirements, or otherwise delineate "the room in magnitude of harm" between the two requirements.  See Komis, 918 F.3d at 298-99 & n.9.  Nevertheless, Burlington Northern "unquestionably leaves in place a plaintiff's burden to show the allegedly hostile work environment was motivated by retaliatory animus," id., and the "severe or pervasive" requirement acknowledges that "less severe isolated incidents which would not themselves rise to the level of retaliation may, when taken together as part of 'the overall scenario,' evidence retaliatory animus, and one severe incident may be enough to create a hostile work environment."  Id. at 293-94 (citing Jensen, 435 F.3d at 450); see also Moore, 461 F.3d at 340-41, 346; Briggs v. Temple Univ., 339 F. Supp. 3d 466, 506 (E.D. Pa. 2018) (Kelly, J.) (requiring a showing that "the employer's intentional discrimination was severe or pervasive" and that "the plaintiff suffered materially adverse action or actions in relation to the hostile work environment") (citing Byrd v. Elwyn, No. 16-02275, 2016 WL 5661713, at *6 (E.D. Pa. Sept. 30, 2016) (Pappert, J.)).  And, in any case, there appears to be little practical difference between the two requirements.  See, e.g., Smith v. RB Distribution, Inc., 498 F. Supp.

3d 645, 663-64 n.6 (E.D. Pa. 2020) (McHugh, J.) ("In <u>Komis</u>, the plaintiff argued that the court's selection of the 'severe [or] pervasive' standard for jury instruction in her retaliatory harassment claim was error because it imposed a higher burden than the 'material adversity' standard.  The Third Circuit concluded that any error was harmless, thereby implying that as to the degree of the harm required for plaintiff to prevail, there is little practical difference between the standards.") (citations omitted).

### 2.     Fennell Fails to Establish a Prima Facie Case of Retaliatory Hostile Work Environment

#### i.     Parties' Arguments

Turning now to Fennell's claim, he contends that Comcast subjected him to a hostile work environment in connection with his filing of the December 2017 internal complaint.[12] Fennell bases his claim on five incidents of alleged retaliatory conduct: (1) Comcast initiated a "scorched earth investigation" into Fennell's "management" style, which resulted in a "documented 'coaching'" of him; (2) Fennell received fewer speaking invitations and was not invited to participate at major LGBTQ+ events at Comcast; (3) Fennell was taken off Comcast's website, and his image was removed from various reports; (4) Perkins and Lau blocked Fennell from backfilling a direct report's position, resulting in more work for him; and (5) Fennell was asked to consider taking a Regional Vice President of Government Affairs position for Comcast's Beltway region, which was considered a demotion.  Resp. to Mot. for Summ. J. 28.

---

[12]     As Comcast notes in its Reply brief, prior to Plaintiff's submission of his Response, there was confusion as to whether he was alleging a separate hostile work environment claim and retaliation claim, or lumping the two together as a retaliatory hostile work environment claim. <u>See</u> Reply 17.  Plaintiff's Response clarifies that it is the latter, and the Court considers his claim as such.

Comcast argues that summary judgment is proper because Fennell "has not established that Comcast engaged in the [five (5) alleged incidents] because of his December 2017 complaint." Reply 18. Rather, according to Comcast, the record reflects that Comcast paid him several million dollars since his Internal Complaint, and there has been no termination, discipline, demotion, or any other adverse employment action against Fennell in the relevant period following his filing of the complaint. Id. at 18-19. Comcast also maintains that Fennell's suggestion of a retaliatory animus is based on his own speculation, that the incidents would not be offensive to a reasonable person, and that at least one Comcast executive, David Cohen, testified that he respected and supported Fennell, and personally ensured that no retaliatory actions were taken against him. Id. at 18-19 (citing Cohen Depo. 33:2-34:14 ("I have jealously guarded his reputation and responsibilities within the company to make sure that nobody holds the filing of this complaint against him and that he continues to have significant responsibilities. And frankly, I've tried to jealously guard my own personal relationship with Mr. Fennell and not raise awkward subjects.")). Additionally, Comcast maintains that it is not liable for any of the incidents because Fennell has not asserted a "tangible employment action." Id. at 21.

Fennell counters that these five (5) incidents constitute severe and/or retaliatory conduct, that this conduct detrimentally affected him, and that Comcast is liable for the conduct of its leaders. Resp. to Mot. for Summ. J. 26-32. He also suggests that "any number of these allegations . . . satisfy the 'materially adverse' standard set forth in Burlington Northern." Id. at 26 n.10.

ii.       **Analysis**

Based on careful consideration of the record, Fennell has failed to establish a prima facie case of retaliatory hostile work environment. Applying the "materially adverse" standard, the

incidents that he alleges, without more evidence, do not constitute the type of significant harms that <u>Burlington Northern</u> recognized as forming the basis of, and preserving the integrity of, retaliation claims under Title VII.  No reasonable jury could find—without more evidence—that being coached on his management style, receiving fewer speaking requests, being taken off the website and his image being removed from reports, not receiving a backfill when requested, and being asked if he would consider a Regional Vice President position, constitute anything more than the "petty slights or minor annoyances" that all employees experience and that take place daily in workplaces across the country.

Additionally, even if these incidents are "materially adverse," Plaintiff has failed to link them to a retaliatory animus.  The sole fact that these incidents all occurred following the December 2017 complaint is not enough to establish retaliatory animus.  <u>Cf.</u> <u>Krouse v. Am.</u> <u>Sterilizer Co.</u>, 126 F.3d 494, 503-04 (3d Cir. 1997) (holding "the 'mere passage of time is not legally conclusive proof against retaliation.'  When temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus.") (quoting <u>Robinson v. Southeastern Pa. Transp. Auth.</u>, 982 F.2d 892, 894 (3d Cir.1993)).  Comcast focuses on Zachem's statement to Fennell that it was time for him to "stop the antics" and "grow up."  <u>See</u> Resp. to Mot. for Summ. J. 30; Pl.'s Counterstatement ¶ 89.  Without citing any case law in support, he states that a reasonable jury could conclude that Zachem's statements, made while his pay discrimination complaint was pending, are evidence of retaliatory animus.  But, viewing the facts in the light most favorable to Fennell, there is nothing in the record connecting Zachem's statements to the protected action, <u>i.e.</u>, the filing of the 2017 Internal Complaint.  There is no evidence as to even the specific time period in which she made these statements, aside from it being post filing of the Internal

Complaint, or whether she was even aware of Fennell's complaint at the time of the statements. Fennell's counsel seemingly did not even question Zachem about these statements at her deposition.  And even if these statements amount to some inference of retaliatory animus, which, again, the record does not support, no reasonable jury could find that this event alone constitutes sufficient evidence to establish retaliatory animus—just as a play cannot be understood by listening to only some of its scenes.  Moore, 461 F.3d at 346 ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.") (quoting Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990)).

Because Fennell cannot establish a prima facie case of retaliatory hostile work environment, summary judgment is appropriate.

### VI.    Conclusion

The Court has analyzed the approximately twenty-three (23) isolated instances Plaintiff cites in the context of his achieving the role of a senior executive, with a very substantial compensation, in a major U.S. corporation.  Plaintiff asks this Court to conclude that the conduct he has described, or words that he has heard by other individuals of higher, lower, or equal rank, establish a prima facie case of Title VII pay discrimination and/or show pretext, or establish a claim for retaliatory hostile work environment.  The Court cannot do so because Plaintiff has simply failed to show any discriminatory or retaliatory animus for which Comcast could be held liable.

There is no evidence, and no fact from which any inferences can be made, that any of the actions or comments on which Plaintiff relies, were made, or considered in any way, or acted upon, by the Comcast executives who had the final responsibility to set Plaintiff's compensation.

Underlying Fennell's opposition to Comcast's Motion for Summary Judgment is the belated assertion that Comcast used him as the "token" gay employee. Fennell defines "tokenism" as "the practice or policy of making merely a token effort or granting only minimal concessions, especially to minority or suppressed groups." Resp. to Mot. for Summ. J. 1. According to Fennell, Comcast has given him the title he has, and some or all of his duties, as a result of a corporate policy of "tokenism," whereby it has leveraged Fennell's highly visible position to its own financial and reputational benefit, without compensating him accordingly. The result, as alleged by Fennell, is a "gay pay gap" at Comcast.

There may be situations where "tokenism" can serve as the basis a company's liability under Title VII for pay discrimination, but there is simply no evidence in the record to support Plaintiff's arguments about "tokenism," and his theory that a policy of "tokenism" has affected decisionmakers in setting his senior-level executive compensation is pure speculation.

The success of a policy of diversity will result in more "different" individuals in a company, school, or courthouse than were previously present. In achieving a goal of equality, increasing diversity may be objectionable to some people who believe that "merit" should be the sole factor in hiring or promotion. However, many other people feel that diversity can be accomplished without reducing quality. Some individuals who work in a company, or a school, or a courthouse, may make derogatory remarks about someone who is diverse. These remarks cannot be interpreted per se as showing discrimination or pretext for which their employer is liable. They do not satisfy the Supreme Court or Third Circuit's requirements to prove discrimination or pretext by the employer, here Comcast.

For the foregoing reasons, Fennell's Motion to Strike is granted in part and denied in part, and Comcast's Motion for Summary Judgment is granted. An appropriate order follows.

O:\CIVIL 19\19-4750 Fennell v Comcast\19cv4750 Memo Re MSJ.doc